**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KORI LYNN ULSHAFER,** | : | **Civil No.  4:23-CV-1181** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **FRANK BISIGNANO,**[1] | : | |
| **Commissioner of Social Security,** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

## I.    Introduction

Social Security appeals are governed by a familiar five-step paradigm. At Step 3 of this process an Administrative Law Judge (ALJ) must determine whether the claimant's impairments are so severe that they meet or equal a regulatory listing which defines a person as presumptively disabled.   In order to satisfy this burden of proof at Step 3, the claimant must show that her impairments meet all of the pertinent listing requirements. This is an exacting burden of proof and persuasion.

---

[1] Frank Bisignano became the Commissioner of Social Security on May 6, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Once the ALJ makes this determination, we are enjoined to apply a deferential standard of review to this Step 3 analysis, a standard of review which simply asks whether there is "substantial evidence" supporting the Administrative Law Judge's (ALJ) determination. With respect to this legal guidepost, as the Supreme Court has explained:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

In the instant case, the plaintiff, Kori Ulshafer, argues that the Administrative Law Judge erred in failing to recognize that his emotional impairments were *per se* disabling. According to Ulshafer this legal error was a product of another error in that the ALJ discounted her own subjective complaints. However, after a review of

2

the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" <u>Biestek</u>, 139 S. Ct. at 1154, we conclude that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner.

## II.    <u>Statement of Facts and of the Case</u>

### A. <u>Introduction</u>

On April 14, 2020, Kori Ulshafer filed a Title II application disability benefits. (Tr. 15). In this application Ulshafer alleged, in part, that she was disabled due to an array of emotional impairments. (Tr. 18).[2] Ulshafer was born on July 3, 1982 and was 37 years old at the time of the alleged onset of her disability, making her a younger worker under the Commissioner's regulations. (Tr. 29).  She had  at least a high school education and prior employment in the corrections field. (Tr. 28-29.

### B. <u>Ulshafer's Emotional Impairments—The Clinical Record and Opinion Evidence.</u>

As the ALJ observed, with respect to Ulshafer's emotional impairments:

The record reflects ongoing mental health treatment on an outpatient basis through September 2021 (7F, 12F, 13F, 14F, 16F, 17F). She

---

[2] While Ulshafer's application also mentioned some physical impairments, her appeal focuses solely upon the ALJ's consideration of her psychological limitations. Therefore, we will confine our discussion to the emotional conditions at issue in this appeal.

reported that she has been out of work as a corrections officer due to an incident that happened with her coworkers, which was unpleasant and caused her to have panic attacks (7F/6). Treatment records generally note that Xanax helps with panic attacks and Effexor was helping in daily life (7F, 14F, 17F). Additionally, depression screenings were either positive for only minimal or no depression (7F, 17F). Treatment records from October 2019 note that the claimant's anxiety and depression were controlled with medication (7F/2). Her depression was again reportedly controlled with medication in July 2020 (7F/10). The records also reflect that the claimant had a friend with whom she sees regularly went to Georgia with her friend during the period at issue (6F, 14F/36). While the treatment record reflects reports that she had a panic attack when she found out that her best friend was moving to Georgia, it notes that it only lasted approximately fifteen minutes and that the claimant was able to calm down and breathe through it (14F/16, 18). Mental status examinations during the period at issue reflect variations in mood at times, but were otherwise generally within normal limits (7F, 13F, 14F, 16F, 17F). However, a new patient examination in July 2021 was positive for psychomotor agitation of fidgeting and picking fingers; dysthymic, anxious, and irritable mood; labile, but mood congruent and redirectable affect; and a short attention span, but was otherwise generally within normal limits (12F). A new patient visit to establish care with a primary care physician in January 2021 notes that the claimant's PTSD, anxiety, and depression were clinically stable and that the claimant was doing well (9F/35).

(Tr. 24).

Given this fairly unremarkable treatment history, no medical source clearly opined that Ulshafer's emotional impairments met a listing requirement which would have defined her as *per se* disabled. Instead, with respect to this issue, three

4

medical opinions that were deemed persuasive by the ALJ[3] indicated that the

plaintiff's psychological impairments did not reach listing level severity. As the ALJ

explained when analyzing these medical opinions:

> The State agency psychological consultant on initial review, Valorie
> Rings, Psy.D., opined that the claimant has moderate limitation in
> interacting with others and adapting or managing oneself, but no
> limitation in understanding, remembering, or applying information and
> concentration, persistence, or maintaining pace and that she could
> understand, remember, and follow simple instructions, in that she could
> perform/follow one and two-step tasks/instructions (1A). The
> undersigned finds this opinion partially persuasive. The undersigned
> finds it persuasive to the extent it is consistent with the evidence of
> record, such as the finding that the claimant could perform simple and
> routine work, but is inconsistent with the finding that the claimant has
> no limitation in concentration, persistence, or maintaining pace, yet is
> limited to one to two-step tasks. As it pertains to Dr. Rings' indication
> that the claimant is capable of performing one to two-step tasks, if that
> is an example and not a limitation, it is consistent with the longitudinal
> evidence of record. However, if it is meant to be a limitation, it is
> inconsistent with the longitudinal evidence, including the claimant's
> reported daily activities, which show that the claimant engages in multi-
> step tasks, including personal care and hygiene, mowing the lawn and
> other household chores, making and attending doctor's appointments,
> weeding the garden, driving a motor vehicle when needed, shopping in
> stores and online, playing video games, and listening to the radio.
> Additionally, considering the claimant ongoing reported complaints of
> interaction difficulties and testimony that she experiences panic attacks
> while in public, the undersigned added additional interaction
> limitations. As for adapting and managing oneself, the undersigned
> finds this portion of the opinion not persuasive, as it is inconsistent with
> the evidence of record, including the relatively benign clinical findings

---

[3] The ALJ's decision found two other medical opinions unpersuasive. (Tr. 27-28).
However, Ulshafer does not appear to challenge the assessment of these medical
opinions on appeal.

on mental status examinations and ability to perform a variety of daily activities, described in detail herein, does not support more than mild limitation in that functional domain.

(Tr. 26).

On reconsideration, a second state agency expert reached similar conclusions according to the ALJ:

> The State agency psychological consultant on reconsideration, Dante Emmanuel Mancini, Ph.D., opined that the claimant has moderate limitation in interacting with others; mild limitation in adapting or managing oneself and concentration, persistence, or maintaining pace; and no limitation in understanding, remembering, or applying information and that she could meet the demands to complete one to two-step tasks on a sustained basis (3A). The undersigned finds this opinion partially persuasive. The undersigned finds it persuasive to the extent it is consistent with the evidence of record, such as the finding that the claimant could perform simple and routine work, but is inconsistent with the finding that the claimant has mild limitation in concentration, persistence, or maintaining pace, yet is limited to one to two-step tasks. As it pertains to Dr. Mancini's indication that the claimant is capable of performing one to two-step tasks, if that is an example and not a limitation, it is consistent with the longitudinal evidence of record. However, if it is meant to be a limitation, it is inconsistent with the longitudinal evidence, including the claimant's reported daily activities, which show that the claimant engages in multi-step tasks, including personal care and hygiene, mowing the lawn and other household chores, making and attending doctor's appointments, weeding the garden, driving a motor vehicle when needed, shopping in stores and online, playing video games, and listening to the radio. Additionally, considering the claimant ongoing reported complaints of interaction difficulties and testimony that she experiences panic attacks while in public, the undersigned added additional interaction limitations.

6

(Tr. 26-27).

Finally, a consulting examining source also opined that Ulshafer's emotional impairments, while severe, were not *per se* disabling. With respect to this opinion, the ALJ concluded as follows:

> The consultative psychological examiner, Jennifer Betts, Psy.D., opined that the claimant has no limitation in understanding, remembering, or applying information and moderate limitation in interacting with coworkers, supervisors, coworkers, and the public, but marked limitation in responding appropriately to work situations and changes in routine (6F). The undersigned finds this opinion partially persuasive. The undersigned finds it persuasive to the extent it is consistent with and supported by the evidence of record, such as the finding that the claimant can perform simple work and limitations regarding interacting with supervisors and coworkers. However, while some concentration, persistence, or pace limitations are warranted and the undersigned afforded additional limitations related to interacting with the public. However, the evidence does not support marked limitation in adapting or managing oneself. More specifically, as for supportability, the consultative examination itself describes depressed mood and affect and was positive for tearfulness at times, but was otherwise generally within normal limits. As for consistency, treatment records also reflect variations in mood and affect, but were otherwise generally within normal limits. Additionally, this opinion is based on a one-time self-reported snapshot of the claimant's alleged mental limitations; however, even the claimant's reported daily activities and allegations do not support marked limitation in adapting or managing oneself.

(Tr. 27).

### C. **The ALJ Hearing and Decision**

It was against this equivocal medical backdrop that Ulshafer's disability claim came to be heard by the ALJ on September 8, 2021. (Tr. 37-69). Following this hearing, on April 18, 2022, the ALJ issued a decision denying Ulshafer's application for benefits. (Tr. 12-30). In that decision, the ALJ first concluded that Ulshafer met the insured status requirements of the Social Security Act through June 30, 2025 and had not engaged in substantial gainful activity since November 5, 2019, her amended alleged onset date. (Tr. 17-18). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Ulshafer had the following severe impairments: anxiety disorder/generalized anxiety disorder, posttraumatic stress disorder (PTSD), major depressive disorder/persistent depressive disorder, panic disorder with agoraphobia, dysthymia, nightmares, obesity, asthma, and vertigo. (Tr. 18).

At Step 3, the ALJ determined that Ulshafer's impairments did not meet or medically equal the severity of any listed impairments. (Id.) In particular, with respect to Ulshafer's emotional impairments, the ALJ found that:

> The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, and 12.15. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of

functioning. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

In understanding, remembering, or applying information, the claimant has a mild limitation. The claimant alleges difficulty following instructions and memory deficits, she reported no difficulties with understanding (4E). The claimant reported that she needs reminders to go places, but that they are not needed for caring for her personal hygiene or taking medication (4E). She also reported that she must re-read written instructions several times (4E). However, she reported that she helps her children with their homework, prepares basic meals, drives a motor vehicle when needed, and manages money (4E, Testimony). Treatment records generally describe full orientation, intact short and long-term memory skills, grossly intact cognitive skills, and coherent, organized, and goal directed thought processes (11F, 12F, 13F, 14F, 16F, 17F). Additionally, the consultative examination describes coherent and goal directed thought process, clear sensorium, full orientation, intact recent and remote memory skills, average cognitive functioning, and appropriate general fund of information (6F). No treating, examining, or reviewing source opined that the claimant has greater limitation in this functional domain (1A, 3A, 2F, 6F). Thus, the evidence of record wholly supports the finding that the claimant's mental impairments cause mild limitation in understanding, remembering, or applying information.

In interacting with others, the claimant has a moderate limitation. The claimant alleges difficulty getting along with others, including authority figures (4E). She reported that she does not want to be around other people most of the time, that she stays home a lot, that she does not visit friends or family as much, and that she is unable to be around crowds (4E). However, she reported that she has never been fired from a job for problems getting along with others (4E). Additionally, the record reflects that the claimant took a weekend trip to Georgia to see her friend's new home, at which time she stayed in a hotel, went to eat at restaurants, walked around the area to see some sights, and went on a small trolley tour of the area (14F/36, Testimony). Moreover,

although she and her husband had balcony seats, she testified that she attended a concert in January 2020, in which there were a lot of people in attendance. She also testified that she has been to a park with her friend and daughter twice since moving to Pennsylvania and reported that she shops in stores and visits with family (4E). Treatment records during the period at issue generally describe cooperative, calm, and friendly attitude; normal speech; normal behavior; normal appearance; good eye contact; and normal thought content without reported hallucinations, delusions, paranoia, or homicidal ideations (1F, 7F, 8F, 9F, 11F, 12F, 13F, 14F, 16F, 17F). Additionally, the consultative examination describes cooperative demeanor, fair manner of relating and social skills, satisfactory grooming and hygiene, appropriate eye contact, fluent and clear speech, and no evidence of hallucinations, delusions, paranoia, or homicidal ideations (6F). The State agency psychological consultants opined that the claimant has moderate limitation in this functional domain (1A, 3A). While the consultative psychological examiner, Jennifer Betts, Psy.D., opined that the claimant has marked limitation in responding appropriately to workplace situations and changes in routine, she opined that the claimant otherwise has moderate limitation in interacting with coworkers, supervisors, and the public (6F). Thus, the evidence of record wholly supports the finding that the claimant's mental impairments cause moderate limitation in interacting with others.

With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. The claimant alleges difficulties with concentration and completing tasks (4E). She further reported that she must re-read written instructions several times and that she does not follow spoken instructions very well due to her lack of focus and concentration (4E). However, she reported that she helps her children with their homework, prepares basic meals, drives a motor vehicle when needed, and manages money (4E, Testimony). The consultative examination also notes that the claimant enjoys music and television (6F). The consultative examination notes only mildly impaired attention and concentration skills, but coherent and goal directed thought process (6F). Treatment records generally describe normal attention span and concentration skills and logical, relevant, and goal directed thought processes (11F, 13F, 14F, 17F). However, at a new

client appointment in July 2021, the record was positive for obsessions with skin picking and short attention span, but also reflects coherent, organized, and goal directed thought process (12F). No treating, examining, or reviewing source opined that the claimant has greater limitation in this functional domain (1A, 3A, 2F, 6F). Thus, the evidence of record wholly supports the finding that the claimant's mental impairments cause moderate limitation in concentration, persistence, or maintaining pace.

As for adapting or managing oneself, the claimant has experienced a mild limitation. The claimant alleges that she is "terrible" at handling stress and changes in routine (4E). However, the record is devoid of inpatient psychiatric hospitalizations or participation in a hospitalization program during the period at issue. Additionally, the record is generally devoid of reported hallucinations, delusions, paranoia, obsessions, or suicidal or homicidal ideations or apparent difficulties with impulse control. The claimant reported that she cares for her children and pets; relatively independently cares for her personal hygiene; prepares basic meals; performs indoor and outdoor household chores, including washing laundry and dishes, vacuuming, dusting, and mowing the lawn with a push mower; shopping in stores and online; generally manages her personal finances; drives a motor vehicle; and leaves her residence unaccompanied (4E). The consultative examination also reflects that the claimant dresses, bathes, and grooms herself on a daily basis despite negative moods 6F). Treatment records generally reflect variations in mood and affect, but were otherwise generally within normal limits (1F, 7F, 11F, 12F, 13F, 14F, 16F, 17F). Additionally, the consultative examination was positive for depressed mood and affect with tearfulness at times but was otherwise generally within normal limits (6F). Primary care treatment records from January 2021 note that the claimant's PTSD, depression, and anxiety were clinically stable and that she was doing well (9F/35). There is no evidence of an inability to set realistic goals, make plans independent of others, travel to unfamiliar places, avoid normal hazards, or take appropriate precautions. No treating, examining, or reviewing source opined that the claimant's mental impairments cause mild limitation in adapting or managing oneself.

11

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The claimant is capable of self-sustainment and the record reveals that the claimant is also capable of some adjustment to minor changes in mental demands. The claimant has not required psychiatric hospitalizations and mental status examinations fail to show significant clinical abnormalities during the period at issue.

(Tr. 19-21).

Between Steps 3 and 4, the ALJ fashioned a residual functional capacity ("RFC"), considering Ulshafer's limitations from her impairments, stating that:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following limitations: the claimant is limited to occupations that require no more than occasional postural maneuvers, such as stooping, kneeling, crouching, crawling, and climbing on ramps and stairs, but must avoid occupations that require climbing on ladders, ropes, and scaffolds. The claimant is limited to occupations that require no more than frequent balancing. The claimant must avoid concentrated prolonged exposure to fumes, odors, dusts, gases, chemical irritants, environments with poor ventilation, temperature extremes, vibration, or extreme dampness and humidity. The claimant must avoid all exposure to hazards, such as dangerous machinery and unprotected heights. The claimant is limited to simple routine repetitive work, generally described as unskilled, with no more than a specific vocational preparation (SVP) of two and that is low stress, defined as only occasional decision making required and only occasional changes in the work setting. The claimant is limited to occupations which require no more than occasional interaction with supervisors and coworkers and no interaction with members of the general public.

12

(Tr. 21-22).

Specifically, in making the RFC determination, the ALJ considered the clinical evidence, the medical opinions, and Ulshafer's self-described activities. Ultimately, the ALJ found based upon this evidence that the plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 23). As the ALJ explained with regard to her emotional impairments:

> As for the claimant's alleged mental functional limitations, the evidence of record does not support greater limitations than those provided herein. The record is devoid of inpatient psychiatric hospitalizations or participation in a partial hospitalization program during the period at issue. Additionally, the record is generally devoid of reported hallucinations, delusions, paranoia, obsessions, or suicidal or homicidal ideations or apparent difficulties with impulse control.
>
> The record reflects emergency treatment for complaints of chest pain with reports that she thought she was just having a panic attack in September 2019 (1F). A cardiovascular work-up was negative; however, a physical examination was positive for anxious mood and affect (1F). Nevertheless, the record reflects that there was no concern for acute psychological decompensation warranting either involuntary or voluntary hospitalization (1F).
>
> The record reflects ongoing mental health treatment on an outpatient basis through September 2021 (7F, 12F, 13F, 14F, 16F, 17F). She reported that she has been out of work as a corrections officer due to an incident that happened with her coworkers, which was unpleasant and caused her to have panic attacks (7F/6). Treatment records generally note that Xanax helps with panic attacks and Effexor was helping in daily life (7F, 14F, 17F). Additionally, depression screenings were

13

either positive for only minimal or no depression (7F, 17F). Treatment records from October 2019 note that the claimant's anxiety and depression were controlled with medication (7F/2). Her depression was again reportedly controlled with medication in July 2020 (7F/10). The records also reflect that the claimant had a friend with whom she sees regularly went to Georgia with her friend during the period at issue (6F, 14F/36). While the treatment record reflects reports that she had a panic attack when she found out that her best friend was moving to Georgia, it notes that it only lasted approximately fifteen minutes and that the claimant was able to calm down and breathe through it (14F/16, 18). Mental status examinations during the period at issue reflect variations in mood at times, but were otherwise generally within normal limits (7F, 13F, 14F, 16F, 17F). However, a new patient examination in July 2021 was positive for psychomotor agitation of fidgeting and picking fingers; dysthymic, anxious, and irritable mood; labile, but mood congruent and redirectable affect; and a short attention span, but was otherwise generally within normal limits (12F). A new patient visit to establish care with a primary care physician in January 2021 notes that the claimant's PTSD, anxiety, and depression were clinically stable and that the claimant was doing well (9F/35).

The claimant presented for a consultative psychological examination in August 2020, at which time she reported that depression and anxiety were predominantly the reasons for her leaving her past work as a corrections officer (6F). However, a mental status examination at that time was negative for significant clinical abnormalities (6F). More specifically, it was positive for depressed mood and affect with tearfulness at times, mildly impaired attention and concentration skills, and fair manner of relating and social skills, but was otherwise generally within normal limits (6F).

Pursuant to SSR 16-3p, if we cannot make a disability determination or decision that is fully favorable based solely on objective medical evidence, then we carefully consider other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms. Other evidence that we will consider includes statements from the individual, medical sources, and any other sources that might have information about the individual's

14

symptoms, including agency personnel, as well as the factors set forth in our regulations. Other non-medical sources may provide information from which we may draw inferences and conclusions about an individual's statements that would be helpful to us in assessing the intensity, persistence, and limiting effects of symptoms. Examples of such sources include public and private agencies, other practitioners, educational and personnel records, non-medical sources such as family and friends, and agency personnel.

As for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they do not support greater limitations than those accounted for herein. In addition to the claimant's limited, routine, and conservative course of treatment, the claimant has retained the ability to perform a wide range of daily activities, described in detail herein. Thus, the evidence of record wholly supports the finding that the claimant's vertigo, asthma, and obesity, considered singly and in combination, do not cause any exertional limitations and are adequately accommodated by limiting her to no more than frequent balancing; occasional stooping, kneeling, crouching, crawling, and climbing ramps and stairs; but avoids occupations that require climbing on ladders, ropes, or scaffolds and avoids all exposure to hazards. To prevent exacerbation of symptoms, the claimant must avoid concentrated prolonged exposure to fumes, odors, dusts, gases, chemical irritants, environments with poor ventilation, temperature extremes, vibration, and extreme dampness and humidity. As for the claimant's mental impairments, the evidence of record wholly supports the finding that her symptoms are adequately accommodated by limiting her to simple, routine, repetitive work, generally described as unskilled, with no more than an SVP of 2 and are low stress, defined as only occasional decision making required and occasional changes in the work setting and is limited to no more than occasional interaction with supervisors and coworkers, but no interaction with the public.

(Tr. 24-25).

Having arrived at this RFC assessment, the ALJ found at Step 5 that there were jobs which existed in substantial numbers in the national economy which

Ulshafer could perform. (Tr. 29-30). Accordingly, the ALJ concluded that the plaintiff did not meet the stringent standard for disability set by the Act and denied this claim. (Id.)

This appeal followed. (Doc. 1). On appeal, Ulshafer contends that the ALJ erred in assessing the severity of her symptoms and failed to recognize that she was *per se* disabled at Step 3 due to her emotional impairments. This case is fully briefed and is, therefore, ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

## III.  Discussion

### A. Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla.

Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

17

> Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence.

Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim made here, based upon alleged inadequacies in the articulation of a claimant's mental RFC. In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the

United States Court of Appeals recently addressed the standards of articulation that apply in this setting. In Hess, the court of appeals considered the question of whether an RFC, which limited a claimant to simple tasks, adequately addressed moderate limitations on concentration, persistence, and pace. In addressing the plaintiff's argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that, "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.'" Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the Hess decision are straightforward. In formulating a mental RFC, the ALJ does not need to rely upon any particular form

of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

### B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process,

the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical

22

opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other

evidence. <u>Biller</u>, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. <u>See Titterington v. Barnhart,</u> 174 F. App'x 6, 11 (3d Cir. 2006); <u>Cummings v. Colvin</u>, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. <u>Burns v. Barnhart</u>, 312 F.3d 113, 129 (3d Cir. 2002); <u>see also Metzger v. Berryhill,</u> No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), <u>report and recommendation adopted sub nom. Metzgar v. Colvin</u>, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); <u>Rathbun v. Berryhill,</u> No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), <u>report and recommendation adopted</u>, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

## C. **Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms**

The interplay between the deferential substantive standard of review that governs Social Security appeals, and the requirement that courts carefully assess whether an ALJ has met the standards of articulation required by law, is also illustrated by those cases which consider analysis of a claimant's reported pain. When evaluating lay testimony regarding a claimant's reported degree of pain and disability, we are reminded that:

> [T]he ALJ must necessarily make certain credibility determinations, and this Court defers to the ALJ's assessment of credibility. See Diaz v. Comm'r, 577 F.3d 500, 506 (3d Cir.2009) ("In determining whether there is substantial evidence to support an administrative law judge's decision, we owe deference to his evaluation of the evidence [and] assessment of the credibility of witnesses...."). However, the ALJ must specifically identify and explain what evidence he found not credible and why he found it not credible. Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir.1994) (citing Stewart v. Sec'y of Health, Education and Welfare, 714 F.2d 287, 290 (3d Cir.1983)); see also Stout v. Comm'r, 454 F.3d 1050, 1054 (9th Cir.2006) (stating that an ALJ is required to provide "specific reasons for rejecting lay testimony"). An ALJ cannot reject evidence for an incorrect or unsupported reason. Ray v. Astrue, 649 F.Supp.2d 391, 402 (E.D.Pa.2009) (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993)).

Zirnsak v. Colvin, 777 F.3d 607, 612–13 (3d Cir. 2014).

Yet, it is also clear that:

> Great weight is given to a claimant's subjective testimony only when it is supported by competent medical evidence. Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979); accord Snedeker v. Comm'r of Soc.

> <u>Sec</u>., 244 Fed.Appx. 470, 474 (3d Cir. 2007). An ALJ may reject a
> claimant's subjective testimony that is not found credible so long as
> there is an explanation for the rejection of the testimony. Social
> Security Ruling ("SSR") 96–7p; <u>Schaudeck v. Comm'r of Social
> Security,</u> 181 F.3d 429, 433 (3d Cir. 1999). Where an ALJ finds that
> there is an underlying medically determinable physical or mental
> impairment that could reasonably be expected to produce the
> individual's pain or other symptoms, however, the severity of which is
> not substantiated by objective medical evidence, the ALJ must make a
> finding on the credibility of the individual's statements based on a
> consideration of the entire case record.

<u>McKean v. Colvin</u>, 150 F.Supp.3d 406, 415–16 (M.D. Pa. 2015) (footnotes omitted).

Thus, we are instructed to review an ALJ's evaluation of a claimant's subjective

reports of pain under a standard of review which is deferential with respect to the

ALJ's well-articulated findings but imposes a duty of clear articulation upon the ALJ

so that we may conduct meaningful review of the ALJ's conclusions.

In the same fashion that medical opinion evidence is evaluated, the Social

Security Rulings and Regulations provide a framework under which the severity of

a claimant's reported symptoms are to be considered. 20 C.F.R. §§ 404.1529,

416.929; SSR 16–3p. It is important to note that though the "statements of the

individual concerning his or her symptoms must be carefully considered, the ALJ is

not required to credit them." <u>Chandler v. Comm'r of Soc. Sec</u>., 667 F.3d 356, 363

(3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or

other symptoms will not alone establish that you are disabled"). It is well settled in

the Third Circuit that "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence." Hantraft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (referring to 20 C.F.R. § 404.1529). When evaluating a claimant's symptoms, the ALJ must follow a two-step process in which the ALJ resolves whether a medically determinable impairment could be the cause of the symptoms alleged by the claimant, and subsequently must evaluate the alleged symptoms in consideration of the record as a whole. SSR 16-3p.

First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p. During the second step of this credibility assessment, the ALJ must determine whether the claimant's statements about the intensity, persistence, or functionally limiting effects of his or her symptoms are substantiated based on the ALJ's evaluation of the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p. This includes but is not limited to medical signs and laboratory findings, diagnoses, and other medical opinions provided by treating or examining sources, and other medical sources, as well as information concerning the claimant's symptoms and how they affect his or her ability to work. Id. The Social Security

Administration has recognized that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p.

Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. Id.; see Koppenaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1995999, at *9 (M.D. Pa. Apr. 8, 2019), report and recommendation adopted sub nom. Koppenhaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1992130 (M.D. Pa. May 6, 2019); Martinez v. Colvin, No. 3:14-CV-1090, 2015 WL 5781202, at *8–9

(M.D. Pa. Sept. 30, 2015); <u>George v. Colvin</u>, No. 4:13–CV–2803, 2014 WL 5449706, at *4 (M.D. Pa. Oct. 24, 2014).

### D. <u>The ALJ's Decision is Supported by Substantial Evidence.</u>

Ulshafer's appeal of this adverse decision faces a series of interlocking obstacles. First, by arguing that the ALJ erred at Step 3 by failing to find that she was *per se* disabled, Ulshafer faces a significant burden of proof and persuasion. At Step 3 of this sequential analysis, the ALJ is required to determine whether, singly or in combination, a claimant's ailments and impairments are so severe that they are *per se* disabling and entitle the claimant to benefits. As part of this step three disability evaluation process, the ALJ must determine whether a claimant's alleged impairment is equivalent to a number of listed impairments, commonly referred to as listings, that are acknowledged as so severe as to preclude substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(iii); 20 C.F.R. pt. 404, subpt. P, App. 1; <u>Burnett</u>, 220 F.3d 112, 119.

In making this determination, the ALJ is guided by several basic principles set forth by the social security regulations and case law. First, if a claimant's impairment meets or equals one of the listed impairments, the claimant is considered disabled *per se* and is awarded benefits. 20 C.F.R. § 416.920(d); <u>Burnett</u>, 220 F.3d at 119. However, to qualify for benefits by showing that an impairment, or

combination of impairments, is equivalent to a listed impairment, a plaintiff bears the burden of presenting "medical findings equivalent in severity to *all* the criteria for the one most similar impairment." Sullivan v. Zebley, 493 U.S. 521, 531 (1990); 20 C.F.R. § 416.920(d). An impairment, no matter how severe, that meets or equals only some of the criteria for a listed impairment is not sufficient. Id.

Moreover, while the ALJ's treatment of this issue must go beyond a summary conclusion, since a bare conclusion "is beyond meaningful judicial review," Burnett, 220 F.3d at 119, case law "does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function ... is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." Jones, 364 F.3d at 505. This goal is met when the ALJ's decision, "read as a whole," id., permits a meaningful review of the SLJ's Step 3 analysis.

In addition, this question of *per se* disability is judged as a general matter under a deferential standard of review. In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S.

at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565.

Finally, when addressing the ALJ's duty of articulation with regard to a claimant's emotional limitations, "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.'" Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

Judged against these deferential standards of review, we are constrained to find that substantial evidence supported the decision by the ALJ that Ulshafer was not disabled. Therefore, we will affirm this decision.

In reaching this result we note at the outset, that to the extent Ulshafer argues that the ALJ failed to sufficiently explain her Step 3 findings, this argument fails in light of the thorough analysis conducted here. The ALJ's decision provided a careful,

and complete, articulation of the reasons why Ulshafer had not established a *per se* disability at Step 3. Drawing upon the clinical record, the plaintiff's activities of daily living and the greater weight of the persuasive medical opinion evidence  the ALJ determined that Ulshafer had not proven that she met all of the pertinent listing criteria. This conclusion was supported by substantial evidence; that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. There was no error here.

Nor was the ALJ required to uncritically accept Ulshafer's subjective reports regarding the severity of his symptoms when engaging in this Step 3 evaluation. Quite the contrary, the ALJ was obliged to assess those subjective reports in light of the clinical evidence, the plaintiff's activities of daily living, and the medical opinion evidence.  In this case, that analysis yielded a conclusion that Ulshafer's complaints were only partially credible and did not satisfy the exacting standards prescribed at Step 3. Once again, substantial evidence; that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019), supported this finding which was consistent with the greater weight of persuasive medical opinions. Thus, in the final analysis, the ALJ's decision in this case, was entirely consistent with settled caselaw, which holds that we should affirm "as long as the ALJ offers a 'valid explanation,'" for a

mental RFC. Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). On this score, it is well-settled that an ALJ offers a valid explanation for a simple task RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, which demonstrated that [s]he is capable of engaging in a diverse array of 'simple tasks[.]'" Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019). In the instant case the ALJ fulfilled this duty by explaining that the plaintiff's allegations regarding the severity of her symptoms were not fully consistent with clinical records, the plaintiff's activities living, and other more persuasive medical opinions. Substantial evidence supported the ALJ's conclusions in this regard. Thus, there was no error here.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" Monsour Med.

Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

## IV.    <u>Conclusion</u>

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.


<u>s/ Martin C. Carlson</u>
Martin C. Carlson
United States Magistrate Judge

DATED: June 4, 2025